c

RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 10 / 29 / 14
          M3

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

KENNETH MIMS                          CIVIL ACTION NO.: 1:13-3120

VERSUS

                                      JUDGE DEE D. DRELL
WARDEN, LSP                           MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION


Before the court is a petition for writ of *habeas corpus* filed by petitioner, Kenneth Mims ("Mims"), pursuant to 28 U.S.C. §2254 on November 22, 2013. Mims contests his 2010 conviction and sentence by a jury in the 9th Judicial District Court, Rapides Parish, State of Louisiana on one count of second degree murder for which he was ordered to serve a mandatory sentence of life imprisonment without the benefit of probation, parole or suspension of sentence (Doc. 1).

Mims raises five grounds for *habeas corpus* relief in his petition: (1) insufficient evidence; (2) lack of competency to stand trial; (3) improper application of Batson; (4) ineffective assistance of counsel; and (6) denial of a fundamentally fair adversarial proceeding.

Mims claims and Respondent admits that Mims exhausted his state court remedies. Accordingly, Mims' *habeas corpus* petition is properly before the undersigned for report and recommendation.

Facts

    The facts of the case, as set forth by the Louisiana Third Circuit Court of Appeal, are as follows:

    Defendant, Kenneth L. Mims, was originally charged with first degree murder. On August 18, 2004, the State amended the indictment to charge Defendant with one count of second degree murder, in violation of La.R.S. 14:30.1.

    The defense filed a "Motion and Order for Appointment of a Sanity Commission" in October 2004. The motion alleged that Defendant demonstrated symptoms of mental illness that could prevent him from understanding the trial proceedings. The motion further asserted a psychologist had examined Defendant and found him to be mentally retarded. The motion finally contended that Defendant may be unable to assist in his defense. The trial court granted a sanity commission, and, on May 31, 2005, the trial court conducted a sanity hearing and determined Defendant was capable of proceeding to trial.

    Voir dire commenced on January 10, 2006. After jury selection, the State objected to the defense's use of peremptory challenges to remove all women from the jury. After listening to arguments by the State and the defense's rebuttal, which included a statement of gender-neutral reasons for the challenges, the trial court granted the State's objections as to Doris Gibbs and Christine Luczak.

    Defendant's jury trial began on January 11, 2006, and lasted through the following day. The trial concluded with the jury unanimously finding Defendant to be guilty of second degree murder. As a result, on January 20, 2006, the sentencing court ordered Defendant to serve the mandatory penalty, life imprisonment without benefit of probation, parole, or suspension of sentence.

    Marlo Davis, with the Rapides Parish Office of Community Services (OCS), was the first witness to testify on January 11, 2006, the first day of trial. As part of her duties and in response to a call around 4:00 p.m., Ms. Davis went to the Huey P. Long Medical Center on June 26, 2002. At the hospital, Ms. Davis met with a social worker who informed her of the two-year-old victim, Christopher Griffin's, diagnosis and prognosis. Ms. Davis then called the Pineville Police Department (PPD) to report the child's injuries, and then spoke to Judge Johnson for an instanter order placing both Christopher and his brother in the State's custody.

Ms. Davis stated that she interviewed Christi Griffin, Christopher's mother, and spoke with Officer Alvarado and Lieutenant Doug Washington from the PPD when they arrived at the hospital. Ms. David observed Christopher before the doctors rushed him to x-ray. She stated that he was limp, and that his face was red.

Officer Billie Alvarado testified as the State's second witness. He stated that he went to the Huey P. Long Medical center on June 26, 2002, in response to a child abuse complaint[;] arriving around 4:53 p.m. Officer Alvarado spoke to Ms. Davis and observed the child being worked on by doctors and nurses.

Officer Alvarado stated that Christopher was lying on his back with his head turned to the left and blood coming out of his mouth, with the child's head swollen, and the area around the child's right eye black.

Lieutenant Doug Washington was the State's third witness. He testified that on June 26, 2002, Officer Alvarado called him to the Huey P. Long Medical Center. After he arrived at the hospital, Lieutenant Washington spoke with Officer Alvarado and Dr. Teneglia. Lieutenant Washington then viewed and photographed Christopher.

Lieutenant Washington next spoke with Ms. Davis, asked Ms. Griffin to contact him at the PPD for a follow-up interview, and summoned Sergeant Fletcher to assist in locating Defendant, who had left the hospital prior to Lieutenant Washington's arrival. Once he and Sergeant Fletcher contacted Defendant, Lieutenant Washington requested Defendant contact him at the PPD. Lieutenant Washington also interviewed Defendant's mother, Nora Mims, and sister, Yasmine Batts.

Lieutenant Washington also testified that Ms. Mims, Ms. Batts, Defendant, Detective Joe Simon, and Detective Keith McLain all accompanied him to Defendant's residence so he could take photographs. In the bathroom, Lieutenant Washington found indentations in the sheetrock at a child's head-level above the child's potty. Lieutenant Washington next returned to the PPD where he interviewed Defendant.

Lieutenant Washington's investigation continued into the next day. On June 27, 2002, Lieutenant Washington called the LSU Shreveport Medical center [sic] to follow up on Christopher's condition. The following morning, Lieutenant Washington and his supervisor, Detective Paul, met with Ms. Griffin at the PPD, and she informed them that Christopher died at 5:00 that morning.

3

Lieutenant Washington explained that he then conducted a second interview with Ms. Griffin and received permission for a second search. Following the search, Lieutenant Washington seized a white snake skin belt belonging to the Defendant and continued his investigation by interviewing Todd Mims, Defendant's brother, and Jerry Williams, a friend of the family.

Lieutenant Washington conducted a second interview with Defendant on August 29, 2002. Lieutenant Washington related that, after Defendant waived his *Miranda* rights, Defendant related the following account of events:

> Mr. Mims stated that anything possibly could have happened to the baby because he was flagged down by Jerry Williams, a friend of the family, and he was advised that the baby-the baby was giving the mother a hard time. He was-he became-he said he was upset about it, came home and immediately disciplined the child-the kids because they would not listen to the mother.
>
> He stated that Jerry advised him that the babies were playing out in the rain-the mother made the baby go out in the rain and kept them out there because they were getting on her nerves. He came home and he disciplined them according to his methods.

Lieutenant Washington explained that Defendant's methods of discipline involved spanking the children with his belt and putting them in a corner. The children were four and two years of age.

Lieutenant Washington recalled that Defendant told him that there were no bruises on Christopher's face when Defendant took him to the bathroom to give the child a bath. Defendant also stated that he put Christopher in two or three inches of bath water before leaving him alone for three to five minutes, and that no one, except he and Christopher, went into the bathroom during that time.

Further, according to Lieutenant Washington, Defendant told him that Christopher was lying lifelessly on his back when he returned to the bathroom. Defendant additionally reported lifting Christopher and taking him to Ms. Griffin.

Finally, Lieutenant Washington testified that Defendant admitted to him that he and Ms. Griffin had been arguing over how Defendant disciplined the children. Lieutenant Washington reported Defendant was five feet eight inches

tall, weighed between 135 and 145 pounds, and had a muscular build.

Defendant's statement given to Lieutenant Washington set forth Defendant's version of events. Defendant stated that he had been told that Ms. Griffin had put the children on the steps, but when he arrived home the children were on the couch. Defendant spanked Christopher's older brother on the backside with a belt and put him in a corner. Because Christopher had vomited on himself, Defendant instructed Christopher to go into the bathroom; Christopher complied. Defendant followed Christopher into the bathroom after he argued with Ms. Griffin.

In his statement, Defendant revealed that he had also spanked Christopher on the backside with a belt once they were in the bathroom. After two or three blows, Defendant stopped hitting Christopher with the belt; instead, Defendant began using his open hand to strike Christopher on his buttocks and the back of his head. Defendant claimed that he used his hand because OCS had told him he would go to jail if he bruised the children. When defendant hit Christopher's head, Christopher fell forward and hit his head on the side of the bathtub. Defendant asserted that Christopher was Conscious and had stopped crying when Defendant put him in the bathtub. Defendant stated that he left Christopher in the bathtub and went to argue with Ms. Griffin, and that when Defendant returned to the bathroom minutes later, Christopher was unconscious.

Mr. Williams was the fifth witness to testify at trial. On June 26, 2002, Defendant's aunt, Bridget Joseph, asked Mr. Williams to check on Defendant. In accordance with Ms. Joseph's request, Mr. Williams went to Defendant's home. Defendant was not present, but Ms. Griffin, Ms. Mims, and Defendant's sister, Candace, were there with Christopher and his brother. Mr. Williams stated that his visit lasted twenty to thirty minutes, and throughout the visit, the two boys loudly whined and cried in the front room. Ms. Griffin became angry, hollered at the boys, and hit Christopher on the side of the head. According to Mr. Williams, the blow caused Christopher to move back a little, but he was still on his feel walking around. Mr. Williams stated he left when Ms. Griffin put the boys outside on the front steps and locked them outside in the rain.

Mr. Williams explained that, after he arrived home, he told Ms. Joseph what had happened during his visit. Later, Mr. Williams saw Defendant who, at the time, was on his way home from work. Mr. Williams told Defendant what had

happened and stated Defendant needed to check on the
children because they had been locked out in the rain.

Ms. Griffin testified as the State's sixth witness. At the
time of trial, Ms. Griffin had two children, a boy age
eight and a girl age two. Ms. Griffin began a relationship
with Defendant in January 2002. In March 2002, Ms. Griffin
and her sons voluntarily moved out of her mother's house
and moved in with the Defendant, Ms. Mims, and the
Defendant's younger brother.

Ms. Griffin recalled waking around 10:00 a.m. on June 26,
2002. When she got up, Ms. Griffin's two sons, Ms. Mims,
Ms. Batts, and Ms. Batt's [sic] children were all present
in the house. Christopher and his older brother were
watching television in the living room. Ms. Griffin sat
with her sons and rocked Christopher to sleep because he
was not acting like himself. According to Ms. Griffin,
Christopher whined and fussed, looked as if he were sick or
sleepy, but was having trouble falling asleep. When
Christopher awoke, he was jumping and crying. Ms. Griffin
gave Christopher some water, but he vomited after drinking.

Ms. Griffin stated she changed Christopher's shirt and sat
with him on the couch while he dozed in and out of sleep.
Ms. Griffin testified that Mr. Williams had visited during
the day, staying fifteen to twenty minutes. Ms. Griffin
said that, during Mr. William's [sic] visit, the boys
continued to watch television from the couch. Ms. Griffin
stayed on the couch the rest of the day.

Ms. Griffin explained that, when Defendant arrived home
from work that afternoon, he was in a rage. Defendant
stripped off his shirt and went into the living room
yelling, "I can't leave this mother f---ing house without
having to come back and hearing things, that y'all don't
know how to behave." Ms. Griffin stated that Defendant
grabbed her older son off the couch, spanked him, and put
him in the corner, and then Defendant yanked Christopher,
who had been sleeping, "off the couch by his arm and threw
him in the corner." During her testimony, Ms. Griffin
asserted the children had not been misbehaving that day.

Ms. Griffin testified Christopher bumped his head on the
television, fell to his knees, and vomited when Defendant
slung him into the corner. Ms. Griffin began yelling at
Defendant, but he did not stop. She stated that he was out
of control.

Ms. Griffin next stated that because Christopher vomited on
his clothing, Defendant yelled for him to go into the
bathroom to take a bath. From her bedroom, Ms. Griffin

heard Defendant whipping Christopher, Christopher screaming, and water running into the bathtub. Ms. Griffin yelled at Defendant, who did not listen, so Ms. Griffin, deciding they both needed time to calm down, went outside and sat on the back steps. Ms. Griffin stated that she heard Defendant stop whipping Christopher, Christopher stop crying, and the bathroom door close. Next, she recalled that Defendant called out to her, saying that something was wrong with Christopher. Defendant carried Christopher out of the bathroom and told her Christopher had fallen while he was in the bathtub.

Ms. Griffin explained that she told Defendant to take him to the hospital. Ms. Griffin testified that she sat in the back with Christopher and talked to him while Defendant drove. Ms. Griffin stated that she yelled at Defendant and demanded to know what happened, but Defendant did not give her a straight answer.

At the hospital, Ms. Griffin had Defendant take Christopher into the emergency room and followed behind. Ms. Griffin could not carry Christopher as she was weak from multiple sclerosis. She stated that Christopher's right eye had already been bruised that morning, but he did not have any other bruising before he went into the bathroom.

Ms. Griffin denied ever spanking her children and said she never had any behavioral problems from them. Ms. Griffin confirmed she pled guilty to negligent homicide based on the circumstances of Christopher's death.

On January 12, 2006, the State called Dr. Elizabeth Tenaglia Azel to testify as the prosecution's seventh witness. The parties stipulated that Dr. Azel was an expert in emergency room medicine. Dr. Azel testified that she worked at Huey P. Long Medical Center on June 26, 2002, and as a part of her duties, she treated Christopher Griffin. Dr. Azel stated that she was standing near the ambulance ramp when a man walked in carrying a child. She recalled that the man said the child had passed out while in the bathtub. Dr. Azel had no further contact with the man, who identified himself as the mother's boyfriend.

Dr. Azel reported that emergency personnel began immediate emergency treatment. The child had diminished consciousness, no verbal skill, extensive bruising over his forehead and around his eyes, and was posturing-extending his arms and legs in an extensive patter, thus indicating brain injury. The emergency personnel gave him oxygen and eventually intubated him. The medical staff performed a CT scan, which revealed: that intracranial blood was located where it did not belong, that Christopher's brain had

shifted to one side because of the swelling, and that Christopher's brain was compressed against the skull.

Dr. Azel asserted that Christopher's bruising would not have been the result of a single blow to the head. Christopher's bruising was also inconsistent with a thirty-two-inch tall individual falling in the bathtub. Further, Dr. Azel stated that the intracranial bleeding was also inconsistent with a fall in the bathtub. According to Dr. Azel's experience, the injuries Christopher had would have been caused by significant and sometimes repetitive force.

Dr. Collie Trant, who qualified as an expert in forensic pathology with a specialty in cases involving children, testified as the State's final witness. Dr. Trant received an examined glass slides of tissue and blood sampled taken from Christopher, a packet of photographs of Christopher (including autopsy pictures), and all of Christopher's medical records, including the autopsy report. Based on the records, Dr. Trant concluded Christopher died from "shaken baby impact shaking syndrome".

Dr. Trant explained shaken baby impact shaking syndrome meant that, in addition to Christopher being severely shaken in a manner causing his head to move back and forth, he was also hit on the head several times with a blunt object around or during that period of shaking. Because Christopher survived more than four hours after his bruises were inflicted, it usually would not be possible to determine when his bruises had been inflicted due to swelling; however, because the emergency room doctors put Christopher on steroids to reduce the inflammation, Dr. Trant was able to determine that Christopher had sustained his injuries less than four hours before being placed on the steroids.

Dr. Trant related that Christopher had severe bruises on the back of his scalp; the underlying tissue had been pulped. Christopher also had a subdural hematoma over the right cerebral hemisphere of his brain, severe swelling of the brain, and a hemorrhage into his eyes when he was presented to the hospital. Dr. Trant opined that Christopher would not have been able to walk with these injuries. So, according to Dr. Trant, if Christopher had walked into the bathroom before losing consciousness, as had been stated by Defendant, he did not have the injuries when he entered the bathroom. Additionally, Dr. Trant stated that Christopher's injuries were not consistent with a fall in the bathtub.

Dr. Trant reported that Christopher was two feet and eight inches tall. Because the bruises on Christopher's head

8

overlapped and blended into one large bruise, Dr. Trant could not determine the number of individual blows that caused the trauma, [sic] however, Dr. Trant guessed it could have been twenty blows.   Dr. Trant said a child Christopher's size could not have inflicted all or even most of the injuries on himself.

On cross-examination, Dr. Trant explained that the retinal hemorrhages had been caused by the shaking because the lack of damage to the fragile bones around the eye indicated the bleeding had not been caused by a blow.   Although vomiting can be a symptom of brain swelling, according to Dr. Trant, Christopher's vomiting, irritability, and jumping during sleep earlier in the day would not have been an indication he was suffering from shaken baby syndrome.   Finally, Dr. Trant testified that the swelling in Christopher's brain caused brain death, that Christopher's injuries would have incapacitated him within ten minutes, and that, individually, either the blunt force or the shaking could have caused the brain trauma, as a single blow could have been responsible for killing Christopher.

Defendant called his mother, Ms. Mims, as his first witness. Ms. Mims and her daughter, Ms. Batts, were living with Defendant and Ms. Griffin at the time of the incident. Ms. Mims stated that she never saw either Defendant or Ms. Griffin discipline the Griffin children, nor did she see Ms. Griffin discipline the children that day.

The second witness for the defense was Ms. Batts.   Ms. Batts testified that she was present all day at the location of the incident, but she did not see anything. Ms. Batts recalled that Defendant came in from work, greeted everyone, and then went with the children into the back of the house, where Ms. Griffin was already located. Ms. Batts stated that she saw, on approximately ten occasions, Ms. Griffin discipline her children by whipping them with a belt when they did something wrong.

On cross-examination, Ms. Batts stated that she had never seen Defendant spank the children.   Rather, she stated that he disciplined them by putting them on their knees in the corner.   Ms. Batts then testified that she overheard Defendant and Ms. Griffin arguing in the back of the house.

Ms. Joseph was the last defense witness.   Ms. Joseph stated that Defendant and Ms. Griffin had lived with her for approximately two months.   During that time, Ms. Joseph observed Defendant discipline the children by yelling at them and putting them in a corner, and, once, used a switch on their legs.   Ms. Joseph said she saw Ms. Griffin discipline the children on at least three occasions with a

cable cord from the VCR. Ms. Joseph said that she had
evicted Ms. Griffin after they argued about the use of the
cord. Ms. Joseph explained that, on the last occasion, Ms.
Griffin beat the children so hard that Ms. Joseph's next
door neighbor overheard and intervened. Ms. Joseph
additionally asserted that she had seen Ms. Griffin strike
the oldest boy with her fist. Ms. Joseph denied ever
seeing Ms. Griffin strike Christopher with her fist.

State v. Mims, 20009 WL154822 (La.App. 3 Cir., 2009)(footnotes
omitted).

### Rule 8(a) Resolution

This court is able to resolve the merits of this *habeas corpus*
petition without the necessity of an evidentiary hearing because there
is no genuine issue of material fact that is relevant to the
petitioner's claims and the State court records provide the required
and adequate factual basis necessary to the resolution of the *habeas
corpus* petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir.
1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir.1980); Habeas
Corpus Rule 8(a).

### Standard of Review

An application for a writ of *habeas corpus* on behalf of a person
in custody pursuant to the judgment of a State court shall be
considered only on the ground that he is in custody in violation of
the Constitution or laws or treaties of the United States. 28 U.S.C.
§2254(a).

Under 20 U.S.C. §2254 and AEDPA, which is applicable to *habeas*
petitions filed after its effective date on April 24, 1996, *habeas*
relief is not available to a state prisoner with respect to a claim
that was adjudicated on the merits in the State court proceedings
unless the adjudication of the claim (1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.  Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254(d)(2).  Martin v. Cain, 246 F.3d 471, 475-76 (5th Cir.2001), cert.den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and, nevertheless, arrives at a result different from Supreme Court precedent.  A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts.  Martin, 246 F.3d at 476, and cases cited therein.

<u>Law and Analysis</u>

<u>Insufficient Evidence</u>

Mims contends the blows he delivered to Christopher Griffin "Christopher", were insufficient to result in "shaken baby impact shaking syndrome" and/or cause Christopher's death.

"Habeas relief under section 2254 on a claim of insufficient evidence is appropriate only 'if it is found that upon the record evidence adduced at trial no rational trier of fact could have found

proof of guilt beyond a reasonable doubt.'" <u>West v. Johnson</u> 92 F.3d 1385, 1393 (5th Cir. 1996), quoting <u>Jackson v. Virginia</u>, 443 U.S. 307 322-26 (1979).  See also, <u>Dupuy v. Cain</u>, 201 F.3d 582, 589 (5th Cir. 2000); <u>Culpit v. Whitley</u>, 28 F.2d 532, 542 (5th Cir.1994), cert. denied, 513 U.S. 1163 (1995).  To apply this standard, the court looks to the elements of the offense as defined by state substantive law. <u>Donahue v. Cain</u>, 321 F.3d 1000, 1004 (5th Cir. 2000).

In 2002, Louisiana Revised Statute 14:30.1 defined second degree murder, in pertinent part, as the "killing of a human being: (1) when the offender has specific intent to kill or inflict great bodily harm; or (2) when the offender is engaged in the perpetration or attempted perpetration of...cruelty to juveniles ... even though he has no intent to kill or to inflict great bodily harm."  Additionally, Louisiana Revised Statute 14:93 defined cruelty to juveniles as "the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child."

Among the evidence presented at trial was the unrebutted testimony of the State's expert witness, Dr. Trant and the recorded statement Mims made to the Pineville Police Department.  Dr. Trant explained the injuries Christopher sustained would have rendered him incapable of walking.  Mims statement showed he sent Christopher to the bathroom for a bath and to be disciplined.  Christopher entered the bathroom on his own and Mims followed shortly thereafter.  Only Mims and Christopher were in the bathroom during the time Mims spanked Christopher him with a belt and hit Christopher with his hand.  Mims

never saw anyone else enter the bathroom while he was in the next room nor did he believe anyone had entered the bathroom during that time. Based solely on this evidence, a juror could reasonably conclude that Mims' conduct constituted the mistreatment of a juvenile and that mistreatment resulted in Christopher's death.    Thus, sufficient evidence exists to support the jury's verdict finding Mims guilty of second degree murder.

Competency

It is well settled that it is a violation of due process to convict a legally incompetent defendant.    Pate v. Robinson, 383 U.S. 375, 378 (1966).    The court's inquiry into whether due process rights have been violated depends upon whether the violation is substantive or procedural.    Holmes v. King, 709 F.2d 956, 967 (5th Cir.1983).    Mims contends his substantive due process rights were violated because he was tried and convicted despite not possessing both "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a factual understanding of the proceedings against him" in order to be tried and convicted.    Dusky v. U.S., 362 U.S. 402, 402 (1960).

> *Habeas* petitioners claiming incompetency bear a "threshold burden of proof which must be satisfied before the *habeas corpus* has a duty to investigate the constitutional challenge further."  This requires a showing that the facts are "sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during trial." "Once petitioner has come forward with enough probative evidence to raise a substantial doubt as to competency, ... [h]e must then go further and prove the fact of incompetency, at least by a preponderance of the evidence."

Washington v. Johnson, 90 F.3d 945, 950 (1996).  (Internal citations omitted).

Mims argues the court failed to consider and rely upon two key pieces of evidence when determining competency: the fact he is mentally retarded, having a Full Range IQ score of 60, and the fact the sanity commission psychiatrist, Dr. Vijaya L. Boppana, found him incompetent.  While the trial court did not directly comment on Mims' mental retardation, it is evident that this was considered as both Dr. Boppana and the sanity commission psychologist, John C. Simoneaux, both made the court aware of Mims' limited intellectual functioning. Additionally, the court did not discuss Dr. Boppana's report; however, a full review of the record shows that the court's decision not to rely upon Dr. Boppana's report was not unreasonable.

Dr. Boppana's report concludes:

> Based on my evaluation, with a reasonable degree of medical certainty, the defendant appears to have knowledge of the seriousness of his crime.  However, due to what appears to be his limited intellectual functioning he does not seem to have [the] capability to understand the legal proceedings at this time.  A formal assessment of his intelligence would greatly h[e]lp in determining his capacity to understand and help his counsel in his defense.

(Doc 12, p. 15-16).  No additional assessment of Mims intelligence was pursued by Dr. Boppana; therefore, he does not and could not comment as to whether Mims was capable of understanding the legal proceedings at a later time.

Dr. Simoneaux's report went a step further and considered Mims competency in light of his mental retardation and IQ score.[1]  He found

---

[1] Dr. Simoneaux evaluated Mims and issued a detailed report regarding his intelligence six months prior to issuing the competency report.  Among his

that while Mims understood the nature and seriousness of the charges, the distinction between a guilty and not guilty plea, the consequences of a guilty or not guilty plea, the differences between the potential verdicts and the consequences of potential verdicts, Mims lacked more than a basic understanding of available defenses, was unable to pick up on and advise counsel of distortions and misstatements during testimony and likely lacked the ability to fully understand questions asked of him should he take the stand. Despite these limitations, Dr. Simoneaux advised Mims could competently proceed if questions were clarified, things were explained simply, he was provided choices between two simple alternatives and he was properly motivated.

The report upon which he relied is less complete than the one relied upon by the court. Both reports were presented to the court and the opinion of Dr. Simoneaux was ultimately relied upon in finding Mims competent to proceed. Mims has failed to present evidence that positively, unequivocally and clearly generates a real, substantial and legitimate doubt regarding his competency. Accordingly, Mims failed to carry his burden of proof, and the claim should be dismissed.

Batson Challenge

Mims also contends the court committed clear error in affirming the prosecution's "reverse-Batson"[2] challenge. Specifically, he argues

---

findings regarding intelligence was that Mims possessed a Full Range IQ score of 60 and was mentally retarded.
[2]   In Swain v. Alabama, 380 U.S. 202 (1965), the United States Supreme Court, found the Equal Protection Clause prohibited the prosecution's use of peremptory challenges to exclude jurors. Roughly 20 years later, the Court issued its opinion in Batson v. Kentucky, 476 U.S. 79 (1986) upholding the principle articulated in Swain and providing a three step process by which

the court erroneously found the prosecution established a *prima facie* showing of gender discrimination and failed to recognize the gender neutral and non-pretextual reasons for striking two jurors.

A state trial court's finding of discriminatory intent is a pure question of fact and, therefore, accorded great deference.  A *habeas* court must "determine whether the trial court's determination ... was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary."  <u>Murphy v. Dretke</u>, 416 F.3d 427, 432 (5th Cir.2005), citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 341 (2003).

The first step in the three step process is to determine whether the challenging party made a *prima facie* showing that peremptory strikes were exercised on the basis of discrimination.  At the close of *voir dire*, the State entered a reverse-<u>Batson</u> objection arguing the defense exercised all of its peremptory challenges to exclude females. The judge tallied the challenges and found three white males and nine females of various races were challenged by the defense.  The State argued the defense left only three females from the first panel, struck all females from the second panel of potential jurors and then back struck the only woman he had left.

Mims contends this hardly establishes a pattern of discrimination against women as there were two women on the jury and one woman serving an alternate. Furthermore, any of the women the defense chose to strike could have been challenged because of their views on

---

the court could determine whether the prosecution was striking a juror based on race.  Less than ten years later, the Court extended <u>Batson</u> to prohibit the defense's use of peremptory challenges to exclude jurors based on race and it extended the <u>Batson</u> line of cases to prohibit striking jurors on the basis of gender.

corporal punishment.   Neither of these arguments is availing as the defense exercised 75% of its peremptory challenges to strike females. Thus, the court was not unreasonable in finding the State established a *prima facie* case of gender discrimination.

Mims further contends the trial court erred when it failed to accept the reasons articulated for striking Ms. Gibbs and Ms. Luczak. Mims articulated two reasons for striking Ms. Gibbs: her brother was charged with issuing worthless checks and she asked too many questions.   Though Mims contends the judge agreed with his assessment that Ms. Gibbs talked too much, it is evident that any comments by the judge were an aside and the real focus was the brother's criminal charge.   Though not specifically stated, the context of the conversation shows the judge took issue that the criminal charges were Ms. Gibbs brothers, not hers, and the issuance of worthless checks in Missouri had little or no bearing on a second degree murder trial in Louisiana.   Mims fails to show this assessment and the ultimate decision to bring Ms. Gibbs back was unreasonable; therefore, the contention lacks merit.

Mims also contends the judge focused on the statement that Ms. Luczak was too attractive rather than the explanation that her beauty would distract the other jurors.   Neither the statement itself nor the reasoning provided for the statement appear gender neutral.   The judge was perfectly situated to determine this as "[c]redibility can be measured by ... demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy."   <u>Miller-El v. Cockrell</u>, 557 U.S.

322, 339 (2003).   The defense failed then and Mims fails now to explain how the comment is either gender neutral or non-pretextual. Accordingly, the claim lacks merit.

Ineffective Assistance of Counsel

To prevail on a habeas complaint of ineffective assistance of counsel, a complainant must meet the two-pronged test set forth by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).   A complainant must prove: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense.   Prejudice exists if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.   To make that determination, the court must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting.   Mims contends counsel was ineffective because he failed to investigate and interview witnesses and prevented Mims from testifying at trial.

Failure to Investigate and Interview Witnesses

Though Mims states his attorney failed to investigate or interview witnesses, he does not specify what investigation should have been conducted or what witnesses should have been interviewed. Moreover, he does not provide any details as to what the investigation would have revealed or what the witnesses would have said that would have supported his case at trial.   Without such allegations or

evidence, Mims cannot establish his counsel was deficient, much less that the deficiency prejudiced his defense.[3]

Denial of Right to Testify

Mims asserts he was denied the right to testify on his own behalf.  He contends the evidence in the case was "very close" and he and his attorney agreed he would testify on his own behalf.  However, counsel rested without calling him to the stand.

It is well settled that a criminal defendant has the right to testify on his own behalf pursuant to the Fifth, Sixth and Fourteenth Amendments.  Rock v. Arkansas, 483 U.S. 44 (1987); Jordan v. Hargett, 34 F.3d 310, 312 (5th Cir.1994).  A defendant can only waive his right to testify if the waiver is knowing, intelligent and voluntary.  Emery v. Johnson, 139 F.3d 191, 198 (5th Cir.1997).  A violation occurs only when the "'final decision that [the defendant] w[ill] not testify [i]s made against his will.'"  Id., quoting United States v. Teague, 908 F.2d 752, 759 (11th Cir.1990), reh'g granted 953 F.2d 1525 (11th Cir.1992), cert. denied 506 U.S. 842 (1992)).

Courts distinguish between interference with the right to testify by defense counsel, and interference by the court or prosecutor.  A petitioner who argues that his attorney prevented him from testifying must satisfy the two prongs of Strickland, 466 U.S. 688 (1984).  Strickland requires that defendant/petitioner show both that: (1) trial counsel's performance was deficient and (2) that the deficient

---

[3] Mims argued during his state post-conviction relief that his aunt should have been called as a witness.  No such argument was made to this court; however, had one been made, it would lack merit.  Not only did defense counsel interview the aunt but he made the sound trial strategy decision not to call her as she was not an eye witness and would not have provided relevant testimony.

performance prejudiced the defense. <u>U.S. v. Mullins</u>, 315 F.3d 449 (5th Cir.2002). A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. The United States Fifth Circuit Court of Appeals has held that counsel's decision not to place a defendant on the stand is a strategy which seldom will support a challenge of ineffective assistance of counsel. <u>Jones v. Cain</u>, 227 F.3d 228, 231 (5th Cir.2000). Federal courts have consistently recognized that such tactical decisions, when supported by the circumstances, are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir.1999), cert. denied 528 U.S. 1013 (1999).

In the case at bar, the trial transcript shows that defense counsel consulted Mims before resting. Though the details of that conversation are not known, it is worth noting that it was sound trial strategy not to call Mims to the stand. He had already provided a version of events to the Pineville Police and if he had taken the stand and made a misstatement, it could have been misconstrued by the State and painted him in a more terrible light.

Mims' own testimony at the state level post-conviction relief hearing undermines his that his attorney refused to allow him to testify. When asked whether he and his attorney discussed his desire to testify, Mims stated he did not recall. He then stated:

> He is my lawyer. He's supposed to explain to me. I don't, like I said, I don't know about these things. I looked for him to explain—he's supposed to be my lawyer. I was going to let him handle the situation… I - - he's my lawyer, I would expect that he's going to do what's right for me…

(Doc. 28, p.79-80).

Based on the foregoing, there is no indication counsel's performance was deficient and, even if there was, there is certainly no indication Mims was prejudiced.

Denial of Fundamentally Fair and Adversarial Proceeding

Mims' final contention is that the cumulative effects of the errors raised herein denied him a fundamentally fair adversarial proceeding. Having found that all of Mims' claims lack merit, there too is no merit to this contention. Accordingly,

Conclusion

**IT IS HEREBY RECOMMENDED** that Mims' petition for *habeas corpus* be **DENIED and DISMISSED WITH PREJUDICE.**

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged. Timely objections will be considered by the district judge before making a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON**

APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana on this ____ day of October, 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE